UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KISSI A. OPOKU,

                              Plaintiff,

        -v-

RICHARD BREGA, BRET WIDA, VINNIE
MARZELLA, and BREGA D.O.T. MAINTENANCE
CORPORATION,

                              Defendants.

Case No. 15-CV-2213 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Kissi A. Opoku
Bronx, NY
*Pro Se Plaintiff*

Jack Schloss, Esq.
Schloss & Schloss, PLLC
Airmont, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Kissi A. Opoku ("Plaintiff"), proceeding pro se, brings this Action against Brega

D.O.T. Maintenance Corp. ("Brega Corp."), Richard Brega ("Brega"), Brett Wien ("Wien"), and

Vinnie Marzella ("Marzella") (collectively, "Defendants"), alleging that Defendants

discriminated against him on the basis of his race, national origin, and color, under Title VII of

the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e *et seq.*[1]  Defendants move to

---

        [1] Although Plaintiff's Amended Complaint names "Bret Wida" as a Defendant, the Court
will refer to him as Brett Wien, the name provided in Wien's signed affidavit.

dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  (Dkt. No. 28.)[2]

For the reasons stated below, the Motion is granted and Plaintiff's Amended Complaint is

dismissed.  However, the dismissal is without prejudice and Plaintiff may file a second amended

complaint.

I.  Background

A.  Factual Background

Plaintiff's Amended Complaint is meandering and difficult to follow.  The Court has read

it to allege the following facts, which are accepted as true for the purposes of the instant Motion.[3]

Plaintiff worked for Brega Corp., a bus and automobile repair shop owned by Brega, as a

---

[2] The Court notes that Defendants refer to their Motion at various times as both a Motion To Dismiss and a Motion for Summary Judgment.  For example, Defendants' Memorandum is entitled "Defendants' Rule 12(b)(6) Motion To Dismiss and Motion for Summary Judgment" and includes a one page section entitled "Summary Judgment Standards and Arguments."  (*See* Dkt. No. 28.)  However, the "Notice of Motion" is entitled "Notice of Motion To Dismiss Plaintiff's Complaint" and asks the Court "for an order pursuant to [R]ule 12(b)(6) of the Federal [R]ules of Civil Procedure granting Defendants' motion to dismiss the complaint in its entirety," (*see* Dkt. No. 28-7), and Defendants' Reply Memorandum is entitled "Reply Affirmation and Memorandum of Law in Further Support of Defendants' Motion To Dismiss," (*see* Dkt. No. 33).  Moreover, Defendants did not submit a statement of material facts as to which Defendants contend there is no genuine issue to be tried, and did not serve and file the "Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment," both of which are required per the Southern District of New York's Local Rules to be submitted with any motion for summary judgment.  *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York R. 56.1(a), 56.2.  Given the inconsistencies, the failure to submit a proper Rule 56.1 statement or Rule 56.2 notice, and the fact that there appears to have been no discovery undertaken yet in this case, the Court construes the Motion as one to dismiss the Amended Complaint under Rule 12(b)(6), and not one for summary judgment under Rule 56(a).

[3] Defendants attach to their moving papers, among other things, an affidavit signed by Defendant Wien and a New York State Division of Human Rights "Determination and Order After Investigation."  However, in adjudicating a Rule 12(b)(6) motion, "a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).  Accordingly, the Court will not consider the documents.

mechanic from approximately 2000 or 2002 until 2006.  (Am. Compl. for Employment

Discrimination ("Am. Compl.") 5 (Dkt. No. 31).)[4]  Within Brega Corp., mechanics' titles and

salaries are determined by the level of experience and skills that they possess.  (*Id.* at 8.)

Mechanics are classified as either "class A," "class B," or "class C" mechanics.  (*Id.*)  A "class

A" or "master" mechanic—the highest level—requires "10 years [or] more experience, and [is

capable of carrying out] maintenance, . . . troubleshooting, [and] research for the source of a

problem."  (*Id.*)  The master mechanics "run[] the shop."  (*Id.* at 7.)  A "class B" mechanic

requires the employee to have "work[ed] as [a] mechanic, for some years, ha[ving] more

experience [working] on . . . [almost] every maintenance on different vehicles."  (*Id.* at 8.)

Plaintiff was a class B mechanic.  (*Id.* at 10.)

In 2006, while conducting a test drive of a customer's car, Plaintiff pulled over and

parked the car to purchase water at a local store.  (*Id.* at 5.)  Plaintiff was reprimanded for the

incident.  (*Id.*)  In addition to the water incident, Plaintiff alleges, more generally, that he was

"treat[ed] . . . like a slave" during that period.  (*Id.*)  For those reasons, Plaintiff quit his job in

2006 to start his own delivery business.  (*Id.*)

In December 2011, Plaintiff received a call from Brega asking Plaintiff to return to Brega

Corp. because the company was under-staffed.  (*Id.* at 6.)  Plaintiff accepted the offer.  (*Id.*)

Over the course of Plaintiff's second term of employment at Brega Corp., Plaintiff claims he was

subjected to discrimination in various contexts.  (*See generally* Am. Compl.)  Plaintiff alleges

that the comments "made it impossible for [Plaintiff] to perform [his] job at the shop."  (*Id.*)  The

---

[4] Plaintiff did not include page numbers or numbered paragraphs in his Amended
Complaint.  Accordingly, the Court will cite to the ECF-generated numbers at the top of each
page.

remarks were made by "white men" and were not directed at "any other white man." (*Id.*) For example, workers in the parts department asked Plaintiff why he was not smiling, some co-workers made fun of the color of Plaintiff's pink jacket, and when customers complained that the garage smelled of fish, Plaintiff was singled out by Brega, who warned Plaintiff "not to bring fish [to] the shop any more," and yelled at Plaintiff to "shut up [and] don't say anything[] . . . [or else] you cannot work here anymore." (*Id.* at 6–7.)

Additionally, Plaintiff alleges that, throughout his tenure, he was scrutinized more than other employees. (*See, e.g.*, *id.* at 17.) When Plaintiff "asked for a part, Mr. Chris," an assistant master mechanic, "[would] be no where around, but after [Plaintiff] asked [someone else] for the parts, Mr. Chris will . . . show up at where [he was] working[,] asking [him a] question about it." (*Id.* at 15, 17.)[5] Plaintiff's coworkers did not experience the same scrutiny on the job. (*Id.*)

During Plaintiff's employment at the company, he was never promoted to the role of master mechanic, while other employees were promoted or hired who allegedly had less experience and who could not competently perform the job. (*Id.* at 9–10, 13.) In 2012, Frank was hired as a master mechanic, but "he [did not] have master mechanic experience to do [the] job." (*Id.* at 9.) Plaintiff was also a better mechanic than Chris, because he was "hired before [Chris], . . . [had] more experience than him," and could undertake "work [that] Mr. Chris cannot do." (*Id.* at 13.) Brega Corp. later hired Steven as an additional master mechanic, (*id.* at 13, 20), but he "[did not] have the ability to do [the job]," (*id.* at 21). Despite Plaintiff's skills, and the fact that Brega and "everybody at the shop kn[ew]" that Plaintiff is a talented mechanic, he had not been promoted, Plaintiff asserts, "because [he is] black." (*Id.* at 23.)

---

[5] The Amended Complaint refers to three Brega Corp. employees as "Mr. Chris," "Mr. Frank," and "Mr. Steven." Because Plaintiff does not provide their last names, the Court will refer to each by his first name.

Plaintiff's Amended Complaint also alludes to being subject to more frequent discipline or reprimands than other employees. (*See, e.g.*, *id.* at 18–19.) On March 5, 2014, Plaintiff was called into the office of Marzella, the Chief Operating Officer, (*id.* at 33), where Plaintiff was informed that three people had complained about Plaintiff's "attitude," (*id.* at 18). Additionally, Plaintiff learned that there were 13 other reports in his employment file attesting to his "bad reputation[]." (*Id.*) Plaintiff requested a hearing on the matter, and told his supervisors that he "[thought] that [it was] a set up [and he] did nothing wrong to [deserve] that treatment." (*Id.*) Plaintiff's supervisors did not hold a hearing. (*Id.* at 19.) Plaintiff alleges that his supervisors were not "treat[ing] everybody at the shop the same" and asks "[h]ow can you do something like that to a black man?" (*Id.*)

At one point, Plaintiff was approached by Wien and Steven regarding a mistake that Plaintiff made in connection with a brake replacement assignment. (*Id.* at 27–28.) Plaintiff had installed "[two] front calipers" backwards, and Steven asked Plaintiff to sign a paper acknowledging the mistake. (*Id.* at 28.) Plaintiff claims that white employees' mistakes, in contrast, were not documented and "they [could] do anything and get away [with] it." (*Id.*)

On April 21, 2014, while Plaintiff was waiting for batteries to charge for a truck he was inspecting, he asked for an additional task to complete. (*Id.* at 30.) Marzella and Steven asked Plaintiff to remove an engine from a "commute county bus." (*Id.*) When Plaintiff explained that he had never worked on that kind of bus before, Marzella told Plaintiff to go home because there were no other assignments for Plaintiff that day. (*Id.* at 31.) Plaintiff clocked out and then went to talk to Jason Brega ("Jason"), Brega's brother and another supervisor at the garage, and Jason told Plaintiff to go home as he was instructed, and to call the next day to see if there was any work for him. (*Id.*)

A longstanding Brega Corp. policy allowed mechanics to bring their own vehicles into the shop for repairs after they had clocked out. (*Id.*) Plaintiff decided to retrieve and charge his own truck's batteries. (*Id.*) When Plaintiff returned, Wien asked Plaintiff, "you [were] told to go home and come tomorrow[,] what are you doing here?" (*Id.*) As Plaintiff returned to his truck, which was parked far from the shop, Wien followed Plaintiff. (*Id.* at 31–32.) Wien began questioning Plaintiff, asking him where Plaintiff was going with the batteries, whether the batteries belonged to Plaintiff, and "acting like [Plaintiff] stole th[e] batteries." (*Id.* at 32.) Wien's questioning "scared the hell out of [Plaintiff]" and Plaintiff began "urinating in [his] underwear," a side effect of the medication he was taking for high blood pressure. (*Id.*) Plaintiff then ran to a bush to continue urinating. (*Id.*) Wien claimed that Plaintiff was urinating on company property. (*Id.*)

After Plaintiff installed the batteries on his truck, he returned to the shop to collect his tools. (*Id.*) Wien confronted Plaintiff, asking him why he was taking the tools and whether he was quitting. (*Id.*) Plaintiff ignored Wien, fearing that "if [he said] anything, it w[ould] end bad [for himself]." (*Id.*) Plaintiff left the shop. (*Id.*)

The following morning, Plaintiff called the shop asking whether there were any assignments for him. (*Id.*) Marzella returned Plaintiff's call, and said that the county bus engine replacement was still available. (*Id.*) When Plaintiff responded that he was unable to complete the replacement, as he had indicated the previous day, Marzella said that "I have to let you go, because [of] the way you treated [Wien] yesterday was not fa[i]r, and the papers on your file." (*Id.* at 32–33.) Plaintiff called Brega, but Brega said he was supporting Marzella's termination decision. (*Id.* at 33.)

B.  Procedural Background

Plaintiff filed his initial Complaint on March 24, 2015.  (Dkt. No. 2.)  Plaintiff filed an Amended Complaint on October 5, 2015, adding Brega D.O.T. Maintenance Corp. as a Defendant, at the request of the Court.  (*See* Dkt. No. 31.)[6]  Construing Plaintiff's lengthy Amended Complaint most liberally, Plaintiff alleges that Defendants, on the basis of race, color, and national origin: (1) failed to promote Plaintiff; (2) subjected Plaintiff to disparate treatment; (3) terminated Plaintiff; and (4) created a hostile workplace, all in violation of the anti-discrimination provisions of Title VII of the Civil Rights Act of 1964.  (Am. Compl. 1–3.)

Defendants filed the instant Motion and accompanying papers on October 8, 2015.  (Dkt. Nos. 28–32.)  Plaintiff filed his opposition papers on November 20, 2015.  (Dkt. No. 32.) Defendants filed their reply on December 17, 2015.  (Dkt. Nos. 33–35.)  Plaintiff filed an additional memorandum on February 1, 2016, (*see* Dkt. No. 36); however, by memo endorsement signed on February 23, 2016, the Court ruled that, in accordance with its Scheduling Order of September 16, 2015, (*see* Dkt. No. 26), it would not accept any sur-reply papers, (*see* Dkt. No. 43).

## II.  Discussion

A.  Standard of Review

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a

---

[6] The Court has treated Plaintiff's Amended Complaint, filed a few days before Defendants filed the Motion, as the operative complaint for purposes of this Motion.  The Amended Complaint was nearly identical to the original Complaint, and any changes between the two did not bear on the Court's decision.

formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (citation and internal quotation marks omitted).  Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563.  A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d

99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F.

Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

Where, as here, a plaintiff proceeds pro se, the court must "construe[] [his] [complaint]

liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of

Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted).  However, "the liberal

treatment afforded to pro se litigants does not exempt a pro se party from compliance with

relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559

(S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga Cty.*, 517 F.3d

601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding

procedural rules and to comply with them." (italics and internal quotation marks omitted)).

B.  Analysis

1.  Plaintiff's Discrimination Claims

Plaintiff's Amended Complaint can be construed as asserting that Defendants

discriminated against Plaintiff based on his race, color, and national origin in three ways:  (1) by

failing to promote him to the position of master mechanic, (2) by scrutinizing him and

disciplining him at work in light of his errors and attitude, and (3) by terminating him.

 Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion,

sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "The substantive standards applicable to

claims of employment discrimination under Title VII . . . are . . . well established."  *Vivenzio v.

City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  To state a prima facie case of discrimination

under Title VII, a plaintiff "must show:  (1) that he belonged to a protected class; (2) that he was

qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *see also Dickens v. Hudson Sheraton Corp., LLC*, — F. Supp. 3d —, 2016 WL 825684, at *12 (S.D.N.Y. Mar. 1, 2016) (same).  The prima facie case does not require that the plaintiff provide "evidence sufficient to show discriminatory motivation," but rather creates "a temporary presumption of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment action against the plaintiff." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 307 (2015) (internal quotation marks omitted).  However, the prima facie case is an evidentiary standard, and not a pleading requirement; therefore, a plaintiff need not *allege* a prima facie case to survive a motion to dismiss his discrimination claim.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) ("[A] complaint in an employment discrimination lawsuit [need not] contain specific facts establishing a prima facie case of discrimination . . . ."); *see also Ingrassia v. Health & Hosp. Corp.*, 130 F. Supp. 3d 709, 719 (E.D.N.Y. 2015) ("A plaintiff alleging employment discrimination thus may withstand a motion to dismiss without pleading each element of a prima facie case." (italics omitted)).

Rather, the Second Circuit has explained that "what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311.  "The facts required . . . to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination," but

rather the facts "need only give plausible support to a minimal inference of discriminatory motive." *Id.*; *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) ("[A] plaintiff must allege that the employer took adverse action against [him] at least in part for a discriminatory reason, and [he] may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination.")  Courts making the plausibility determination should do so "mindful of the elusive nature of intentional discrimination" and the concomitant frequency by which plaintiffs must "rely on bits and pieces of information to support an inference of discrimination, i.e., a 'mosaic' of intentional discrimination." *Id.* at 86–87 (italics and some internal quotation marks omitted) (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)).

Defendants do not dispute that Plaintiff has alleged that he is a member of a protected class.  Further, Plaintiff alleges that between his two periods of employment at Brega Corp. he was employed as a mechanic for the company for at least seven years, was asked to return to Brega Corp. after quitting in 2006, and that he was able to diagnose problems that even master mechanics could not troubleshoot, (*see* Am. Compl. 5–6, 13, 21–23); therefore, he adequately alleged that he was qualified for his position, *see, e.g.*, *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) ("[W]here . . . the employer has already hired the employee, the inference of minimal qualification is not difficult to draw."); *id.* ("The qualification necessary to shift the burden to [the] defendant for an explanation of the adverse job action is minimal; [the] plaintiff must show only that he possesses the basic skills necessary for performance of the job." (alteration and internal quotation marks omitted)); *Virag v. Goodwill Indus. of W. Conn., Inc.*, No. 11-CV-1499, 2015 WL 540607, at *4 (D. Conn. Feb. 10, 2015) ("With regard to being

qualified for any particular position, . . . only a minimal showing of qualification [is required] to establish a prima facie case." (italics and internal quotation marks omitted)).[7]

The Court thus focuses its inquiry on whether Plaintiff has adequately alleged that he suffered an adverse employment action, and whether there are sufficient allegations that give "plausible support to a minimal inference of discriminatory motivation" for the adverse actions. *Littlejohn*, 795 F.3d at 311.

### a.  Adverse Employment Action

The Court construes Plaintiff's Amended Complaint as alleging the following adverse employment actions:  (1) excessive scrutiny and general criticism of his work (*see, e.g.*, Am. Compl. 13, 17); (2) 13 written demerits in his file for his "bad reputation" and "having an attitude," (*see id.* at 18); (3) a formal violation/discipline report Plaintiff signed after he mistakenly installed calipers backwards during a brake job, (*see id.* at 28–29); (4) failure to promote Plaintiff to the position of master mechanic, (*see id.* at 23); and (5) termination of employment, (*see id.* at 32–33).[8]  Plaintiff's failure to promote claim will be addressed in a separate section.

_____

[7] Although Plaintiff acknowledges in his Amended Complaint that he made some mistakes, "[t]o show 'qualification' . . . the plaintiff need not show perfect performance or even average performance."  *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (some internal quotation marks omitted).  Further, to the extent Plaintiff was written up for poor attitude or other misconduct, such misconduct "is distinct from the issue of minimal qualification to perform a job."  *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010) (internal quotation marks omitted).

[8] The Court notes that Plaintiff attaches to his opposition papers an additional violation/discipline report indicating that Plaintiff marked a work order as finished despite his failure to insert a fuel filter in the vehicle, and that he missed work on January 19, 2014.  (Pl.'s Resp. to Defs.' Mot. To Dismiss ("Pl.'s Resp.") Ex. F (Dkt. No. 32).)  Plaintiff apparently refused to sign the report.  (*See id.*)  However, Plaintiff expressly alleges that this report was created after he was terminated, (*see* Pl.'s Resp. at unnumbered 6 (stating that the document was "written after my employment was terminated" as a "cove[r] up"), and thus the Court does not

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."  *Vega*, 801 F.3d at 85 (internal quotation marks omitted).  The action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (internal quotation marks omitted).  Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices unique to a particular situation."  *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

Plaintiff has alleged at least one adverse employment action:  his termination.  *See, e.g.*, *Humphries v. City Univ. of N.Y.*, No. 13-CV-2641, 2013 WL 6196561, at *7 (S.D.N.Y. Nov. 26, 2013) (describing termination as the "quintessential materially adverse employment action").  Whether any of the other alleged conduct rises to the level of an adverse employment action is less obvious, and depends upon whether the general criticism and scrutiny, written demerits, and formal violation led to Plaintiff's termination.  That is because excessive scrutiny, criticism, and negative evaluations of an employee's work are not materially adverse employment actions unless such conduct is "accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss."  *Siddiqi v. N.Y.C. Health & Hosp. Corp.*, 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008); *see also Jaeger v. N. Babylon Union Free Sch. Dist.*, — F. Supp. 3d —, 2016 WL 3198276, at *7 (E.D.N.Y. June 7, 2016) ("[C]riticism of an employee in the course of evaluating and correcting [his] work is not, in itself, a materially adverse employment action." (internal quotation marks omitted)); *Dimitracopoulos v. City of N.Y.*, 26 F Supp. 3d 200, 214

---

consider the report as another example of allegedly disparate discipline, or as a reason for his termination.

(E.D.N.Y. 2014) ("A thin-skinned worker's reaction to criticism by a supervisor will not support a claim of . . . discrimination unless it is outside the bounds of appropriate supervision."); *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 217 (E.D.N.Y. 2014) ("[N]egative reports or evaluations . . . can be considered adverse employment actions when they give rise to material adverse changes in work conditions." (internal quotation marks omitted)); *Abraham v. Potter*, 494 F. Supp. 2d 141, 147 (D. Conn. 2007) ("[R]eprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." (internal quotation marks omitted)); *Castro v. N.Y.C. Bd. of Educ. Personnel*, No. 96-CV-6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions.").

Plaintiff alleges that he was fired "because [of] the way [he] treated" a supervisor immediately preceding his termination *and* because of "the papers on [his] file." (Am. Compl. 32–33.) Plaintiff does not elaborate on what papers were in his file and, for example, whether it was the violation/discipline report or the 13 written demerits that were the reason for his termination. Because the Court finds that Plaintiff has not sufficiently alleged facts supporting an inference of discrimination, the Court will assume for purposes of this Motion, without deciding, that Plaintiff has sufficiently alleged that the demerits and violation/discipline report led to his termination and thus qualify as adverse actions for purposes of his discrimination claim.[9]

---

[9] The Court acknowledges that this question might ultimately be irrelevant. To the extent that the excessive scrutiny, formal demerits, and violation/discipline report are not adverse actions, but *were* racially motivated, they would still support Plaintiff's claims, specifically his

b.  Inference of Discrimination

i.  Discipline-Related Adverse Employment Actions

The Court first considers the adverse employment actions related to the discipline of

Plaintiff.  As noted above, Plaintiff's Amended Complaint must "give plausible support to a

minimal inference of discriminatory motivation" behind the various write-ups and the violation

report placed into Plaintiff's file.  *Littlejohn*, 795 F.3d at 311.  "An inference of discrimination

can arise from circumstances including, but not limited to, 'the employer's criticism of the

plaintiff's performance in ethnically degrading terms; or its invidious comments about others in

the employee's protected group; or the more favorable treatment of employees not in the

protected group; or the sequence of events leading to the plaintiff's discharge."  *Id.* at 312

(quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

Nothing in Plaintiff's Amended Complaint alludes to any direct racial or national origin

component to any of Defendants' actions.  Plaintiff does not allege the use of any ethnically

degrading language or invidious comments about other employees in Plaintiff's classification.

*Cf. O'Diah v. Yogo Oasis*, 954 F. Supp. 2d 261, 272 (S.D.N.Y. 2013) (finding sufficient facts to

support an inference of discrimination where there was evidence that a supervisor "made

numerous discriminatory remarks concerning [the plaintiff's] race and national origin throughout

his employment" including "that 'You Nigerians can't be trusted.'").  Nor does Plaintiff provide

---

claim that his termination was motivated by discrimination.  *Cf. Lessey v. Broadway Elec.*, No.
08-CV-3884, 2009 WL 3755471, at *4 (S.D.N.Y. Nov. 2, 2009) (observing in context of
analyzing discrimination claim related to employee's termination that "[the] plaintiff does not
come forward with evidence to demonstrate that other employees were treated differently based
on race"); *cf. also Ellis v. N.Y.C. Dep't of Educ.*, No. 07-CV-2042, 2010 WL 2816334, at *5 n.4
(S.D.N.Y. July 16, 2010) ("Here, of course, the observations and evaluations contributed, in
some sense, to [the plaintiff's] termination, a stand-alone adverse employment action; therefore,
the [c]ourt need not address them separately.").

any allegations that would justify an inference that certain facially neutral comments—such as the alleged mocking of Plaintiff's pink jacket and questions about why he would not smile, (*see* Am. Compl. 7)—were actually related to Plaintiff's protected characteristics.  *Cf. Daniel v. T & M Prot. Resources LLC*, 87 F. Supp. 3d 621, 635 (S.D.N.Y. 2015) ("Other statements—for instance, . . . vaguely commenting on [the plaintiff's] clothing—may well be viewed as obnoxious, but, on this record, they have no apparent link to [the plaintiff's] membership in a protected class." (citation omitted)), *reconsideration denied*, 2015 WL 783349 (S.D.N.Y. Feb. 24, 2015); *Bryant v. Begin Manage Program*, 281 F. Supp. 2d 561, 570 & n.7 (E.D.N.Y. 2003) (finding that comments about the plaintiff's clothing and dyed blonde hair would not, on their own, give rise to an inference of discrimination, but such an inference was plausible when the comments were considered in conjunction with a comment that the plaintiff was a "wannabe," meaning "someone wanting to be white" (alteration and internal quotation marks omitted)).  Rather, Plaintiff relies exclusively on allegations that white employees were afforded more favorable treatment.  More specifically, Plaintiff appears to argue that white employees—specifically, Chris, Frank, and Steven—were not formally written up to the same extent as Plaintiff.  For example, Plaintiff's Amended Complaint asks:

- "The question is[,] this performance, is [it] on Mr. Frank['s] record? Or [because] he is whit[e] that is not necessary."  (Am. Compl. 11.)

- "Can they tell me that is on Mr. Chris['s] and Mr. Frank['s] file?  If not how come when I make a mistake installing the brake calipers wrong they write it down and let me [sign] it."  (*Id.* at 15.)

- "Did somebody write something about that and put it on those people['s] file[s] for someone to come and read it to see their performance at the shop?"  (*Id.* at 20.)

- "Mr. Chris came now he is assistant master mechanic, all his bad performance, as I said above there nobody has writ[ten] anything on []his file, for somebody to come and read it."  (*Id.* at 27.)

- "What about the mistake, Mr. Chris, Mr. Frank, and Mr. Steven have been doing, . . . are they treating them the same as they are treating me?  Do they have it on their files? Or nobody know anything about it, or they are doing that to me just because I am black?"  (*Id.* at 28.)

The question, therefore, is whether Plaintiff's allegations that Chris, Frank, and Steve committed mistakes but were not formally written up plausibly support a minimal inference that Plaintiff's violation/discipline report and various attitude-related write-ups were motivated at least in part by racial discrimination.  The Court finds that they do not.

"[A] plaintiff alleging discrimination based on disparate disciplinary treatment must demonstrate that [he] was subject to an adverse employment action and that a similarly situated employee not in the relevant protected group received better treatment."  *Campbell v. Cty. of Onondaga*, No. 04-CV-1007, 2009 WL 3163498, at *15 (N.D.N.Y. Sept. 29, 2009) (internal quotation marks omitted).  Furthermore, a "[p]laintiff must demonstrate that [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself]." *Jenkins v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 09-CV-12, 2009 WL 3682458, at *7 (S.D.N.Y. Oct. 29, 2009) (internal quotation marks omitted); *see also Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A plaintiff relying on disparate treatment evidence 'must show [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself].'") (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  Courts consider, among other factors, (1) "whether the plaintiff and those [he] maintains were similarly situated were subject to the same workplace standards"; and (2) "whether the conduct for which the employer imposed discipline was of comparable seriousness."  *Jenkins*, 2009 WL 3682458, at *7; *see also Graham*, 230 F.3d at 40 ("[A] plaintiff must show that [his] co-employees were subject to the same performance evaluation and discipline standards.").

"Although the question of whether an employee is similarly situated to the plaintiff is generally a question of fact for the jury to decide," courts in the Second Circuit "have held that the plaintiff must at least plead allegations from which it is plausible to conclude that the comparators are similarly situated." *Offor v. Mercy Med. Ctr.*, — F. Supp. 3d —, 2016 WL 929350, at *12 (E.D.N.Y. Mar. 10, 2016); *see also Littlejohn*, 795 F.3d at 312 (reviewing district court's decision granting motion to dismiss and noting that "the district court correctly concluded that adverse actions taken against employees who are not similarly situated cannot establish an inference of discrimination"); *McDowell v. North Shore-Long Island Jewish Health Sys., Inc.*, 839 F. Supp. 2d 562, 569 (E.D.N.Y. 2012) ("With respect to a comparator analysis, all that a plaintiff is required to allege, at the pleadings stage, is that he is a member of a racial class, he was punished more severely than those outside of his racial class who were similarly situated in all material respects, and the severity of that punishment is related to his race . . . ."); *cf. Yang v. Dep't of Educ.*, No. 14-CV-7037, 2016 WL 4028131, at *9 (S.D.N.Y. July 26, 2016) ("[T]he law does not require detailed pleadings regarding the similarly situated comparators."). Although Plaintiff's burden is not substantial, the Court finds that Plaintiff's Amended Complaint does not satisfy it.

With respect to the 13 written demerits, Plaintiff vaguely refers to them as "13 papers of bad reputations." (Am. Compl. 18.) Other allegations indicate that the write-ups may address his "having an attitude," and at least one said that Plaintiff is "loud," a reference, Plaintiff believes, to the fact that he sings a song when he is feeling "lazy." (*Id.*)[10] Plaintiff's allegations

---

[10] Indeed, Plaintiff attaches to his opposition papers a letter he wrote to Brega Corp.'s human resources department dated March 6, 2014—the day after he was told that some have complained of his "attitude" and that he had 13 papers of "bad reputation"—which reinforces that the complaints on file addressed his attitude and not his work performance. He states that he

regarding what he believes Chris, Frank, and Steven should have been written up for are all vague, (*see, e.g.*, *id.* at 27 (referring to Chris's "bad performance"); *id.* at 28 ("What about the mistake[] Mr. Chris, Mr. Frank, and Mr. Steven have been doing . . . ?  Do they have it on their files?)), and to the extent Plaintiff pinpoints specific "mistakes," or "bad performances," they relate to some general disagreement with them about how to diagnose a problem or address a vehicle in the shop (with Plaintiff claiming his approach was the right one).  For example, Plaintiff alleges that in January 2013, Frank told Plaintiff to remove and replace the engine of a bus that was experiencing an "injector problem."  (*Id.* at 10.)  Before doing so, Plaintiff took the bus for a test drive and determined that the problem could be solved instead by merely changing the engine oil and filter.  (*Id.*)  Plaintiff asks whether "this performance[] is on Mr. Frank['s] record."  (*Id.* at 11; *see also id.* at 13–15 (when Chris and Frank decided to replace an engine on a bus that could not pass an inspection, Plaintiff figured out that the solution was to tighten a plastic hose on a deep stick pipe, and Plaintiff asks "[c]an they tell me that is on Mr. Chris['s] and Mr. Frank['s] file"); *id.* at 19–20 (Chris and Steven could not determine the problem affecting an engine that Plaintiff also was stumped by, and Plaintiff asks if "somebody write[s] something about that and put it on those people['s] file[s]"); *id.* at 25–26 (Steven and Chris misdiagnosed a problem and chose to do the job in a very expensive manner, and Plaintiff asks "[w]ho is getting blame" for it).)  As best the Court can tell from Plaintiff's Amended Complaint, this is different conduct than that underlying Plaintiff's 13 "papers of bad reputation," which, to the extent Plaintiff elaborates on them, appear to address attitude issues.  If Plaintiff alleged that he was reprimanded and then fired for failing to properly diagnose problems with cars in the

---

was "accused of having ATTITUDE," and that "there are 13 documents on my file saying I am the bad person in the shop."  (Pl.'s Resp. Ex. G.)

shop, his allegations with respect to Chris's, Frank's, and Steven's failures to properly diagnose, but without any similar repercussions, would more plausibly support an inference of discriminatory motivation. *See, e.g.*, *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234, 2014 WL 5587349, at *19 (E.D.N.Y. Nov. 3, 2014) (finding that the plaintiff's discrimination claim fails because she did not "identif[y] [any] coworkers . . . who engaged in similar misconduct without being disciplined"), *aff'd*, 639 F. App'x 6 (2d Cir. 2015).  But Plaintiff has not so alleged.  The same is true for the violation/discipline report filed for Plaintiff's erroneous brake caliper installation.  Plaintiff was disciplined for his failure to complete a discrete task correctly.  Plaintiff alleges that Chris, Frank, and Steven should have been disciplined for their inability to diagnose certain car problems.  (*See, e.g.*, Am. Compl. at 13 (asserting that "any diagnos[is]" Chris did "came out wrong"); *id.* at 23 ("Those white men running the shop . . . cannot diagnose any problem on engines right . . . .").)  Because Plaintiff does not allege that he and his comparators engaged in the same or even similar misconduct, Plaintiff has not adequately pleaded allegations "from which it is plausible to conclude that the comparators are similarly situated," *Offor*, 2016 WL 929350, at *12, and, therefore, has not adequately alleged disparate treatment that could plausibly support even a minimal inference of discrimination, *see, e.g.*, *Risco v. McHugh*, 868 F. Supp. 2d 75, 100 (S.D.N.Y. 2012) ("A proposed comparator is not similarly situated in all material respects unless [he] engaged in all of the same misconduct as plaintiff, or at least committed the most serious of the infractions for which the plaintiff was subjected to an adverse employment action." (internal quotation marks omitted)); *Jenkins*, 2009 WL 3682458, at *8 (holding that the plaintiff's "claim based upon disparate disciplinary treatment fails" because the plaintiff's comparator "is not alleged to have engaged in all of the same misconduct as [the] [p]laintiff and cannot be said to have been

similarly situated in all material respects" (internal quotation marks omitted)); *see also Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 457 (2d Cir. 2009) (affirming grant of summary judgment where the plaintiff "provided no evidence that similarly situated black workers were punished differently than white coworkers for actual, comparable incidents").

Moreover, Plaintiff's alleged comparators—Chris, Frank, and Steven—are all master mechanics or assistant master mechanics.  Master mechanics and assistant master mechanics "run[] the shop," (Am. Comp. 7; *see also id.* at 8); they "help[] mechanics . . . solve any problems they cannot overcome on their [own], make every decision on any jobs mechanics do at the shop," and before a mechanic "will change any part on a vehicle or do any work on a vehicle, [the master mechanic] should approve it, (*id.* at 8; *see also id.* at 24, 30 (describing both Steven and Frank as his "boss")).  As such, Plaintiff "is not similarly situated to [Chris, Frank, and Steven] because [they] w[ere] Plaintiff's supervisor[s] and had different responsibilities." *Hassan v. City of Ithaca*, No. 11-CV-6535, 2015 WL 5943492, at *11 (W.D.N.Y. Oct. 13, 2015); *see also Haggood v. Rubin & Rothman, LLC*, No. 14-CV-34, 2014 WL 6473527, at *12 (E.D.N.Y. Nov. 17, 2014) ("To the extent [the] plaintiffs seek to compare themselves to Desz and Russo, i.e., by alleging that Lacoste reprimanded them and not Desz, and that Russo was not treated the same as Hodge following their verbal altercation, they, as [the] plaintiffs' supervisors, are clearly not similarly situated to [the] plaintiffs in all material respects."); *Hesse v. Dolgencorp*, No. 10-CV-421, 2014 WL 1315337, at *21 (W.D.N.Y. Mar. 31, 2014) ("On the outset, . . . Dollar General's District Manager[] cannot be said to be similarly situated to [the] [p]laintiff as her superior."); *Prescod v. Am. Broad. Co.*, No. 77-CV-6125, 1985 WL 430, at *14 (S.D.N.Y. Mar. 19, 1985) ("Supervisors are not 'similarly situated employees.'").  Indeed, courts addressing the "similarly situated" question consider, among other things, whether the plaintiff

and the comparator "shared the same supervisors," *Beauchat v. Mineta*, No. 03-CV-3196, 2006

WL 2711608, at *7 (E.D.N.Y. Sept. 21, 2006), *aff'd*, 257 F. App'x 463 (2d Cir. 2007); *see also*

*Mento v. Potter*, No. 08-CV-74, 2012 WL 1908920, at *9 (W.D.N.Y. May 25, 2012) (same).

Here, Steve, one of the master mechanics, even signed Plaintiff's violation/discipline report as

the "manager." (*See* Pl.'s Resp. to Defs.' Mot. To Dismiss ("Pl.'s Resp.") Ex. D (Dkt. No. 32);

*see also* Am. Compl. 27–28.) Given that the master mechanics are running the shop, making all

decisions about troubleshooting cars, and overseeing the Class B and Class C mechanics,

Plaintiff has not adequately alleged that he and his comparators/supervisors are subject to the

same workplace standards or share the same supervisors with respect to the performance of their

job requirements.

Accordingly, Plaintiff has not sufficiently alleged facts supporting even a minimal

inference of discrimination surrounding his disciplinary record.

### ii.  Termination

As noted above, Plaintiff also claims that he suffered discrimination when Defendants

terminated his employment. (Am. Compl. 33.) The question is whether Plaintiff has alleged

facts that could give rise to a plausible inference that his termination occurred because of his

race. The Court finds that Plaintiff has failed to do so, for much the same reasons described

immediately above.

One set of circumstances that can give rise to an inference of discrimination is "the

sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal

quotation marks omitted). The events precipitating Plaintiff's termination, however, indicate no

racial animus. The day before he was terminated, Plaintiff refused to take on an assignment that

he deemed was beyond his qualifications, and, because there was no other work, he was sent

home for the day.  (Am. Compl. 30–31.)  He clocked out, but returned to work to charge the

batteries of his own truck.  (*Id.* at 31.)  When Plaintiff returned, Wien questioned why Plaintiff

was back at the garage, and eventually followed him back to his truck, questioning Plaintiff

about the batteries and "acting like [Plaintiff] stole th[e] batteries."  (*Id.* at 31–32.)  Wien's

questioning "scared the hell out of [Plaintiff]" and Plaintiff began "urinating in [his] underwear,"

and then ran to a bush to continue urinating.  (*Id.* at 32.)  Plaintiff eventually returned to the shop

to collect his tools.  (*Id.*)  As Plaintiff returned to his truck, he ignored various people as they

asked Plaintiff if he was quitting.  (*Id.*)  The following day Marzella called Plaintiff and told him

that he "ha[d] to let [him] go," in part "because the way [he] treated [Wien] yesterday was not

fa[i]r."  (*Id.*)  The above interaction with Wien contains nothing suggesting race or national

origin discrimination motivated the decision to terminate Plaintiff.

Accordingly, the only allegations Plaintiff is left with to suggest even a minimal

inference that Plaintiff was terminated due to his race, are the same ones underlying Plaintiff's

allegedly disparate treatment described above in connection with the non-termination adverse

employment actions.  However, the Court has already determined that those allegations do not

plausibly support even a minimal inference of discriminatory motive.  Plaintiff has therefore not

sufficiently alleged that he was terminated because of his race in violation of Title VII.

### 2.  Failure to Promote

As noted, Plaintiff's Amended Complaint can be construed as alleging that he suffered

discrimination when Defendants failed to promote him.  *See, e.g.*, *Stewart v. City of N.Y.*, No. 11-

CV-6935, 2012 WL 2849779, at *6 (S.D.N.Y. July 10, 2012) ("Failure to promote . . . qualif[ies]

as an adverse employment action under Title VII.").[11]  In order to establish a prima facie case of discrimination due to a failure to promote, Plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] applied and was qualified for a job for which the employer was seeking applicants; (3) [he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the [P]laintiff's qualifications." *Rodriguez v. City of N.Y.*, No. 13-CV-6552, 2014 WL 1399415, at *2 (E.D.N.Y. Apr. 10, 2014) (internal quotation marks omitted).[12]  The application requirement "cannot be established merely with evidence that a plaintiff generally requested promotion consideration." *Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004) (italics omitted); *see also Digilov v. JPMorgan Chase Bank, N.A.*, No. 13-

---

[11] The Court acknowledges that Plaintiff did not check off "Failure to promote me" on his form discrimination complaint.  (*See* Am. Compl. 2.)  However, the Court must interpret the Amended Complaint "to raise the strongest arguments that it suggests." *Chavis*, 618 F.3d at 170 (alterations and internal quotation marks omitted).  The Amended Complaint repeatedly refers to the position of master mechanic as a position that Plaintiff was qualified for and a position that was instead given to less qualified white co-workers.  (*See, e.g.*, Am. Compl. 13 ("Everybody at the shop know[s], [including Brega], and his brother Jason . . . , [that] I do the jobs, nobody can do, [and] if I have a problem, and I cannot solve it, . . . nobody can help me, but I am just class B[] mechanic, not master mechanic . . . .").)  Most directly, Plaintiff alleges that his supervisors "know [he is] good," and that he could be "upgrade[d] . . . to master mechanic," but that "because [he is] black, [his supervisors] don't want to upgrade [him] to that position."  (*Id.* at 23; *see also* Pl.'s Resp. at unnumbered 7 ("I think because I am [a] [b]lack man that is the reason why I will be doing Master Mechanic work, and still be [a] class B[] mechanic . . . .").)  The Court construes these allegations to raise a discrimination claim based on a failure to promote theory.

[12] Plaintiff sufficiently alleged that he was qualified for the position of master mechanic—in fact, Plaintiff claims to have been more qualified than several non-black individuals who were promoted or hired instead of him.  (*See, e.g.*, Am. Compl. 9, 13, 21–23, 29; Pl.'s Resp. at unnumbered 6–7.)  Plaintiff alleges, for example, that he was more experienced than Frank to carry out the duties of a master mechanic, such that when Plaintiff asked Frank for help, he would respond that "[Plaintiff] is . . . on [his] own on that job, [and he] ha[s] to find a way to fix that problem by [himself]."  (*Id.* at 9.)  Similarly, Plaintiff alleges that Steven was "hired as a master mechanic . . . but he don't have the ability to do it."  (*Id.* at 20–21.)  With respect to his own skills, Plaintiff alleges that "[e]verybody at the shop know[s] . . . [that Plaintiff] do[es] the jobs [that] nobody can do, [and] if [he has] a problem and . . . cannot solve it, . . . [then] nobody can help [him]."  (*Id.* at 13.)

CV-975, 2015 WL 685178, at *11 (S.D.N.Y. Feb. 18, 2015) (same).  Rather, "[a] specific application is required to ensure that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination by the employer."  *Petrosino*, 385 F.3d at 227 (alteration and internal quotation marks omitted); *see also Guzman v. City of N.Y.*, No. 06-CV-5832, 2010 WL 4174622, at *10 (E.D.N.Y. Sept. 30, 2010) (same).

The Second Circuit has held that the specific application requirement is applicable at the motion to dismiss stage.  *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) ("[A plaintiff is] require[d] . . . to *allege* that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." (emphasis added)).  Although *Brown* was decided before *Swierkiewicz*, which held that a plaintiff need not plead a prima facie case to adequately plead a Title VII discrimination claim, courts in the Second Circuit have generally still required that plaintiffs allege that they applied for the position at issue.  *See, e.g.*, *Clark v. Leading Hotels of the World, Ltd.*, No. 15-CV-8, 2015 WL 6686568, at *3 (S.D.N.Y. Oct. 29, 2015) ("For a successful Title VII claim based on a failure to promote, the plaintiff must 'allege that she or he applied for a specific position or positions and was rejected therefrom . . . .'" (quoting *Brown*, 163 F.3d at 710)); *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 442 (S.D.N.Y. 2014) (noting that "several courts in [the Southern District of New York]—while recognizing *Swierkiewicz*—have nonetheless relied on *Brown* to dismiss failure-to-promote claims where [the] plaintiff failed to allege that he or she applied for an open position" and collecting cases); *Romaine v. N.Y.C. Coll. of Tech. of the City Univ. of N.Y.*, No. 10-CV-431, 2012 WL 1980371, at *3 (E.D.N.Y. June 1, 2012) ("Although the pleading requirements of the Federal Rules of Civil Procedure are not identical to the requirements of a prima facie claim of discrimination, for purposes of pleading a

plausible failure to promote claim, a plaintiff is still required to allege that he or she applied specifically for the position in question." (citation omitted)); *see also Dawson v. N.Y.C. Transit Auth.*, 624 F. App'x 763, 769–70 (2d Cir. 2015) ("[O]rdinarily, our precedent requires that a plaintiff allege that he applied for a specific job opening . . . ."). Although Plaintiff repeatedly alleges that he is "just [a] class B[] mechanic, not [a] master mechanic," (Am. Compl. 13), or that after "[a]ll th[ese] years and all this experience I have with [th]is company[,] I am still class B[] mechanic," (*id.* at 27), and alleges that "because I am black, may be they don't want black man to become master mechanic at the shop," (*id.* at 10), Plaintiff notably fails to plead that he had actually *applied* for and was rejected from the master mechanic position, (*see generally id.*).[13]

_____

[13] The Court recognizes that "what it means to 'apply for a specific position' depends on the circumstances." *Stewart*, 2012 WL 2849779, at *6. As with the rest of the Amended Complaint, Plaintiff's description of the hierarchy of positions at Brega Corp. and how one qualifies for a promotion is less than clear. Plaintiff alleges that "[t]o become a master mechanic or class A mechanic, you have to have more th[an] 10 years [of] experience, and can do every maintenance, all troubleshooting, research for the source of the problem[] from [the] computer[] and from asking people to make the job done." (Am. Compl. 8.) This language appears to provide the minimum requirements for the position of master mechanic and does not allege, for instance, that Brega Corp. automatically considers each mechanic for the master mechanic position after ten years, and will promote that mechanic if he can demonstrate that he can do everything Plaintiff described. This is especially true given that the master mechanic "run[s] the shop," (*id.* at 7) (thus limiting the number of class B mechanics that can be promoted to master mechanic), and that at least Steven seems to have been hired from outside Brega Corp. to be a master mechanic, (*id.* at 15 ("Steven was introduced . . . to me as a new master mechanic . . . ."); *id.* at 20 ("Steven was hired as master mechanic . . . .")). If Brega Corp. had a policy of automatically considering class B mechanics for promotion after 10 years and Plaintiff was denied the opportunity, he should so allege in any amended complaint. *Cf. Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 679 (S.D.N.Y. 2012) (observing, in the context of granting summary judgment dismissing the plaintiff's failure to promote claim, that the plaintiff "has offered evidence neither that she asked to be considered for promotion but was not, nor that Columbia had a schedule for promotion (after 'x' number of years, all employees are continually considered for promotion) from which she was excluded").

The Second Circuit has, however, recognized an exception to the "specific application" requirement.  Specifically, there is a "narrow" exception to this requirement when a plaintiff can demonstrate that "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures."  *Petrosino*, 385 F.3d at 227; *see also Billups v. Dent Wizard Int'l Corp.*, No. 05-CV-9356, 2010 WL 2541361, at *8 (S.D.N.Y. June 14, 2010) (same); *Butts v. N.Y.C. Dep't of Hous. Preservation & Dev.*, No. 00-CV-6307, 2007 WL 259937, at *11 (S.D.N.Y. Jan. 29, 2007) (same).

Although Plaintiff's Amended Complaint can be read to allege that a master mechanic position vacancy opened—e.g., when Steven was hired to replace Frank (*see* Am. Compl. 15)—he does not allege that the opening was not posted and that he lacked knowledge of the opening, or that he knew about the opening and attempted to apply for the position through informal procedures.  While he alleges that "everybody at the shop," knew that Plaintiff was good at his job, including his supervisors, and that he was "suppose[d] to . . . [be] upgrade[d] . . . to master mechanic," (*id.* at 23), he does not allege that he ever even spoke with anyone about the position, let alone that he sought to apply.  Accordingly, because Plaintiff failed to allege that he applied for the master mechanic position, either formally or informally, Plaintiff's failure-to-promote claim fails.  *See, e.g.*, *Clarke*, 2015 WL 6686568, at *3 (dismissing the plaintiff's Title VII claims because "she never states that she applied for a particular position"); *Shah v. Tunxis Cmty. Coll.*, No. 14-CV-712, 2015 WL 4254909, at *5–6 (D. Conn. July 14, 2015) (granting motion to

dismiss failure-to-promote claim where the plaintiff "had knowledge of the vacancy before it was filled, and . . . did not attempt to apply for it, or even express an interest in it, at any time").[14]

### 3.  Hostile Work Environment Claim

A liberal construction of the Amended Complaint reveals a potential claim of hostile work environment on account of Plaintiff's race.  (*See, e.g.*, Am. Compl. 2 (checking off "Unequal terms and conditions of my employment" on Amended Complaint form); *id.* at 7 ("All th[ese] remarks made it impossible for me to perform my job at the shop.").)  Title VII "prohibits the creation of a hostile work environment."  *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013).  "In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Rivera v. Rochester*

---

[14] In a recent summary order, the Second Circuit, after acknowledging that the plaintiff's allegations in his complaint did not place his failure to allege a specific application within the narrow exception described in *Petrosino*, held nonetheless that the plaintiff adequately alleged a failure to promote claim because the facts alleged made it "reasonable to infer that any application for a particular vacancy would have been futile."  *Dawson*, 624 F. App'x at 770.  To the extent that a plaintiff can be excused for not formally applying for a position because doing so would be futile, Plaintiff's claim still fails.

In *Dawson*, the plaintiff "alleged a four-year campaign of letter-writing, phone calls, and in-person meetings to secure a medical evaluation and restoration to his previous position," and "alleged that [the] [d]efendant's agents represented to him on multiple occasions that they were aware of his request and were considering it."  *Id.* at 769.  Here, however, Plaintiff makes no allegations with respect to *any* informal efforts or any statements or representations made by Defendants that may have deterred Plaintiff from applying because such an application would have been futile.  *See Barrett*, 39 F. Supp. 3d at 443 (finding that a plaintiff adequately alleged a failure to promote claim where she alleged that "she discussed a particular opening with her manager, that he emphasized that she was competing against 'two very well qualified candidates' who were both male, and that, based on his statements, she 'understood' that he 'was clearly advising her not to apply'").  Liberally construing Plaintiff's Amended Complaint, he is at best alleging only that "an 'aura of discrimination' in the workplace somehow discouraged [him] from filing a formal application," which is insufficient to satisfy the exception to the requirement.  *Petrosino*, 385 F.2d at 227.

*Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)).  "In considering whether a plaintiff has met this burden, courts should 'examin[e] the totality of the circumstances, including:  the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'"  *Id.* (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (alterations in original)).  Moreover, the "test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted).  Of course, "[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic," such as race or national origin.  *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

Plaintiff's allegations that could be construed as supporting his hostile work environment claim include (1) sporadic comments from co-workers, such as when his co-workers would make fun of his pink-colored jacket, ask him why he did not smile, or would make him "beg" before giving Plaintiff certain automobile parts, (Am. Compl. 7); and (2) Plaintiffs' supervisors wrongfully reprimanding him, criticizing his work or attitude, otherwise overly scrutinizing Plaintiff's work, or failing to help Plaintiff with his work, (*see, e.g.*, *id.* at 6, 10–11, 16–17, 22, 25).  The Court finds that these allegations cannot support a finding of a hostile work environment that is "sufficiently severe or pervasive to [have] alter[ed] the conditions of [Plaintiff's] employment and create an abusive working environment."  *Rivera*, 743 F.3d at 20

(internal quotation marks omitted).  The Second Circuit's recently found similar allegations

insufficient to state a hostile work environment claim in *Littlejohn*.  In that case, the Second

Circuit rejected

> Littlejohn's hostile work environment claim[,] [which was] predicated on the
> following allegations:  [Littlejohn's supervisor,] Baker made negative statements
> about Littlejohn to [Baker's supervisor,] Mattingly; Baker was impatient and used
> harsh tones with Littlejohn; Baker distanced herself from Littlejohn when she was
> nearby; Baker declined to meet with Littlejohn; Baker required Littlejohn to
> recreate reasonable accommodation logs; Baker replaced Littlejohn at meetings;
> Baker wrongfully reprimanded Littlejohn; and Baker increased Littlejohn's
> reporting schedule. Baker also sarcastically told Littlejohn 'you feel like you are
> being left out,' and that Littlejohn did not 'understand the culture' at [Littlejohn's
> place of employment].

*Littlejohn*, 795 F.3d at 321 (footnote omitted); *see also Marshall v. N.Y.C. Bd. of Elections*, 322

F. App'x 17, 18 (2d Cir. 2009) ("[The plaintiff's] allegations that her supervisor displayed a

violent temper, stood over her with clenched fists on several occasions, disparaged her

educational background, and engaged in crass behavior are troubling.  But Title VII is not a

'general civility code for the American workplace;' it prohibits only harassment that is

discriminatory."); *Marcus v. Barilla Am. NY, Inc.*, 14 F. Supp. 3d 108, 114 (W.D.N.Y. 2014)

(rejecting hostile work environment claim where the plaintiff complained that her supervisor

"was critical of her performance, openly disagreed with her concerning work-related issues,

yelled at [the] plaintiff and accused her of . . . hindering the plant's progress" (internal quotation

marks omitted)).  And with respect to his co-workers statements, "it is well established that

simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely

serious) will not support a hostile work environment claim."  *Yan v. Ziba Mode Inc.*, No. 15-CV-

47, 2016 WL 1276456, at *6 (S.D.N.Y. Mar. 29, 2016) (alteration and internal quotation marks

omitted); *see also Brodt v. City of N.Y.*, 4 F. Supp. 3d 562, 570 (S.D.N.Y. 2014) (same).

Accordingly, Plaintiffs' allegations that at times his pink jacket was mocked, he was asked why

he did not smile, and he was "asked . . . to beg" for certain automobile parts, (Am. Compl. 7), are insufficient to establish an environment "that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Littlejohn*, 795 F.3d at 320–21 (internal quotation marks omitted).[15]

Moreover, none of the incidents alleged by Plaintiff explicitly invoked his race or national origin. Indeed, Plaintiff has not pled any facts, aside from his claim that his coworkers "are not [making comments] to[] any other white man," (Am. Compl. 7), or a non-specific reference to "derogatory statements," (Pl.'s Resp. at unnumbered 6), "that would establish a nexus between the incidents underlying his hostile workplace claim and his race," *Giscombe v. N.Y.C. Dep't of Educ.*, No. 12-CV-464, 2013 WL 829127, at *6 (S.D.N.Y. Feb. 28, 2013); *see also Offor*, 2016 WL 929350, at *16 (finding that proposed amended hostile work environment claim was futile in part because "none of the allegations [underlying the claim] are explicitly race . . . based"); *Rivera v. Brooklyn Hosp. Med. Ctr.*, 28 F. Supp. 3d 159, 163 (E.D.N.Y. 2014) (finding the plaintiff's hostile work environment "based on ethnicity, [to be] hardly conceivable" where "only one remark . . . referenced his ethnic origin in the entirety of his hostile work environment allegations"). Accordingly, Plaintiff has failed to adequately allege that his workplace was "permeated with *discriminatory* intimidation, ridicule, and insult," let alone to such a degree that is sufficiently severe or pervasive to constitute an abusive work environment. *See Petrosino*, 385 F.3d at 223 (emphasis added) (internal quotation marks omitted); *see also Marshall*, 322 F. App'x at 19 ("Title VII is not a general civility code for the American

---

[15] It bears noting that Plaintiff alleges that "I don't think I have any problem with anybody at the shop" and that he and his co-workers "jo[ke] together, [they] talk together, and [they] laugh together." (Am. Compl. 18–19.)

workplace; it prohibits only harassment that is discriminatory." (internal quotation marks omitted)).

### 4.  Dismissal Without Prejudice

Given that this Opinion was the first disposition of Plaintiff's claims on the merits, the Court sees fit to dismiss Plaintiff's case without prejudice, in keeping with the special solicitude afforded to pro se litigants.  *See Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) ("A pro se plaintiff should be afforded an opportunity fairly freely to amend his complaint." (alteration, italics, and internal quotation marks omitted)); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir. 1991) (noting that a district court should not dismiss an action without granting leave to amend at least once when the complaint gives "any indication" that a valid claim may be stated (internal quotation marks omitted)).  Moreover, as the Court has alluded to throughout this Opinion, Plaintiff's Amended Complaint and opposition papers are meandering and difficult to comprehend, and the Court believes Plaintiff should be provided one more opportunity to more clearly convey his allegations of discrimination.  *See Harris v. NYU Langone Med. Ctr.*, No. 12-CV-454, 2013 WL 3487032, at *16 (S.D.N.Y. July 9, 2013) (explaining that the plaintiff's "submissions are muddled and convoluted, making it difficult for the Court to evaluate whether [his] claims are sufficient to survive a motion to dismiss," but noting that "[t]he allegations made . . . by [the plaintiff] may support a claim that [he] was treated differently than similarly situated individuals because of [his] race" and thus allowing the plaintiff to re-plead his claims), *adopted as modified by* 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013).

In deciding whether to file a Second Amended Complaint, Plaintiff should bear in mind the deficiencies in his Amended Complaint discussed above.  If Plaintiff does file a Second Amended Complaint, he should try his best to clearly state his claims and the allegations

supporting such claims, guided by the Court's rulings in this Opinion. Plaintiff is advised that a Second Amended Complaint replaces the current Amended Complaint currently pending before the Court in its entirety and therefore must include all of his claims and factual allegations against all Defendants against whom he wishes to proceed.

## III. Conclusion

In light of the foregoing, the Court grants Defendants' Motion and dismisses Plaintiff's Amended Complaint. As discussed, the Court will give Plaintiff 45 days to submit a Second Amended Complaint which will replace the Amended Complaint in its entirety.[16] The Clerk of Court is respectfully directed to terminate the pending motion. (Dkt. No. 28.)

SO ORDERED.

Dated:     September 30, 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[16] The Second Amended Complaint shall name only Brega Corp. as a Defendant. As the Court informed Plaintiff at its pre-motion conference, "individuals are not subject to liability under Title VII." *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009) (quoting *Patterson v. Cty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 n.8 (2d Cir. 2006) (same); *Perry v. State of N.Y. Dep't of Labor*, No. 02-CV-7566, 2003 WL 22327887, at *1 (S.D.N.Y. Oct. 10, 2003) (noting that "the Second Circuit has unambiguously denied" holding "individual supervisors . . . personally liable as employers for discriminatory conduct under Title VII"). Accordingly, claims against Wien, Brega, and Marzella are dismissed *with* prejudice.

33